*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

VALENTINO ESTEBAN SALINAS,

Defendant-Appellant.

UNPUBLISHED
July 16, 2025
9:39 AM

No. 369707
Wayne Circuit Court
LC No. 19-006220-01-FC

Before: LETICA, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84, and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1).[1] Defendant was sentenced to concurrent terms of 30 to 45 years' imprisonment for second-degree murder and 3 to 10 years' imprisonment for AWIGBH to be served consecutively to the two-year sentences imposed for the felony-firearm convictions. We affirm.

## I. FACTUAL BACKGROUND

This case arises out of a shooting at a bar in Detroit, Michigan, resulting in the death of Neri Marroquin and injury to Francisco Torres. Defendant was at the bar with a group of four other men, including Clifford Sabin and Randy Rhoads, Jr., his uncle.[2] Marroquin was also at the bar with a different group, including Gregory Ehly and Yasira Reyes, who was Marroquin's girlfriend. Torres was at the bar alone.

---

[1] Defendant was originally charged with first-degree premeditated murder, MCL 750.316(1), and assault with the intent to commit murder (AWIM), MCL 750.83, but convicted of the lesser included offenses.

[2] The two other men did not want to talk to or cooperate with the police.

Around closing time at 2:00 a.m., on May 11, 2019, Sabin and Ehly engaged in a verbal altercation near a punching bag game at the back of the bar. Marroquin was not there when the altercation began, but elsewhere in the bar with Reyes. After Marroquin expressed concern that he had not seen Ehly in a while, Reyes and Marroquin found Ehly near the punching bag game, arguing with Sabin. According to Reyes, Marroquin attempted to diffuse the situation, saying: "[C]ome on, we came here to have a good time, drop that." But, according to defendant, Marroquin was attempting to escalate rather than quell the argument. Rhoads, who was also present during the squabble, testified that he believed he saw Marroquin reach in his pants. Rhoads testified that he said: "[C]ome on, man, let's go, cause he's got something in his pants." Rhoads conveyed this information not only to Sabin, but also to his group. Notably, the bar's security officers searched patrons for weapons before they were allowed to enter; however, defendant and Rhoads challenged the efficacy of the pat-down searches conducted.

There was also conflicting testimony about whether defendant's group was escorted out by security or simply left. There was, however, no dispute that defendant's group waited in the parking lot because Sabin wanted to physically fight Ehly.

The bar's extensive surveillance system captured the group's presence and the events that followed. Defendant's group was in the parking lot for about 10 minutes. Early on, Sabin asked defendant to go to Sabin's car and retrieve Sabin's gun.[3] Defendant did so and handed the firearm to Sabin, who racked it and gave it back to defendant, stating: "Take this. Do something." Defendant put the gun in the pocket of his hoodie.

Ehly left the bar with another man in his group. Sabin approached Ehly in a fighting stance. Ehly punched Sabin. Around this time, Marroquin was leaving the bar. Reyes later told the police that Marroquin was in the bar's doorway, yelling, "[S]top, stop, stop. . . ." Although defendant testified at trial that he fired the gun numerous times, he said he acted out of fear for his life because he saw Marroquin put his hand on a gun handle in his pants.

Marroquin died of multiple gunshot wounds. Torres was struck by another bullet as he held the bar's door open for a group of women.

Defendant fled. The police did not find any weapons near Marroquin's body and never recovered the murder weapon. However, the police gathered five .9-millimeter shell casings, a fired bullet, and a lead fragment. All of the shell casings were fired by the same weapon.

Ten days later, the police interviewed defendant. A redacted copy of defendant's video-recorded interview was played during trial. Initially, defendant denied being at the bar where the shooting occurred and distanced himself from certain members of his group. Eventually, defendant admitted hearing about someone dying at the bar, but he was "never up there. . . ." Even after the police informed defendant that they knew he was there, defendant insisted he "wasn't up there. . . ." The police then showed defendant photographic stills from the bar's surveillance videos.

---

[3] To be clear, there is no audio on the security footage.

Defendant was asked about Sabin and admitted seeing him; however, defendant denied knowing Sabin's name. Asked about Sabin again, defendant said that he did not know Sabin and that defendant came to the bar with Rhoads. According to defendant, Sabin was already at the bar and was referred to as "Turtle" or "something with a T."

Rhoads and defendant left the bar after security broke up the altercation near the punching bag game. Defendant claimed that he did not know what had happened at the bar. After again being told about the surveillance cameras showing that he was present, defendant said that "they were about to fight or something" when someone at the bar's door "goes to pull out a gun," "shots started firing," and "everybody just started running."

Asked who fired the shots, defendant said that he started running after hearing the shots. The police then informed defendant that the gun was in defendant's hand because of the muzzle flash visible on the security footage. Defendant responded: "I never had no gun in my hand. . . . I never shot no gun." After repeating that they had video, that there was only one gun and that nothing was taken from Marroquin at the scene, defendant responded that the man with dreads and glasses (Marroquin) pulled up a gun during the encounter near the punching bag game and asked, "what's the problem?" Defendant again admitted that security arrived and his group went outside. It was about five to ten minutes before Ehly came outside.[4]

When the police inquired about where defendant had retrieved the gun from, he said it belonged to someone else and he had retrieved it from a nearby field. After further discussion, the police again asked about the gun's ownership. Defendant eventually said that the man depicted in the earlier photograph the police had shown him (Sabin) gave defendant the key to his car to retrieve the gun; however, defendant continued to maintain that he "didn't know his [Sabin's] name. . . ."

The police then told defendant that, from the video, it appeared as though he had handed Sabin the gun and that Sabin had racked it before handing it back to defendant. Defendant responded that he "never met up with him (Sabin)." The police again explained what the video showed. Defendant then admitted that that was exactly what had happened.

Defendant denied that he was afraid of Sabin and continued to insist that he did not know Sabin that well. Defendant explained that he retrieved Sabin's semi-automatic from Sabin's car's glove box.

---

[4] The video reflects that it was approximately ten minutes.

When Sabin handed the semiautomatic gun to defendant, Sabin said: "Take this and do something."[5] Although defendant had earlier denied being afraid of Sabin, he said that he was afraid of Sabin.[6] Defendant claimed that his cousin knew Sabin.

Defendant described Sabin approaching Ehly to fight after Ehly walked out of the bar. Marroquin came out, and it appeared he was about to do something with the gun.

Defendant shot about three times because Sabin said "shoot the gun" or "shoot 'em." Marroquin "had his hands in his pants when he came out the door," and defendant "felt in fear for his life." Although the police opined that the videotape showed Marroquin just exiting the bar, defendant asserted that Marroquin was outside.

After the shooting, Sabin took the gun. Defendant said he left with Rhoads.

The police informed defendant that Torres was also shot. When the police asked defendant why he had not come forward, defendant said that he was afraid for his life, and, if anyone knew he was at the police station, "they would probably try to kill" him.

Defendant continued to maintain that he did not know Sabin that well and had just seen him driving around his area. Defendant said that people called Sabin something with a T, like "Turtle" or "Twin."[7]

Returning to the point in time that Sabin racked the weapon and handed it to defendant, the police asked why defendant did not just leave. He responded that he felt like he could not "run off by himself" and he did not think "everything would go down like that."

Confronted with the fact that Sabin had told him to shoot somebody, defendant eventually recognized that "he did" and that, in handing the gun to defendant, Sabin was "like no you do it."[8]

Defendant again reported that he "just felt scared of" Sabin. And, although defendant's grandmother recalled him buying the black Nike sweatshirt he was wearing during the shooting, defendant said that he returned the sweatshirt to its female owner after he had borrowed it.

---

[5] When defendant testified at trial, he said that Sabin "never told [him] to do anything with [the gun]" and that defendant thought that the gun was for protection.

[6] Although defendant was not a gang member, he told the police that he thought Sabin was. Later testimony at trial revealed that Sabin had a criminal history, including being convicted of murder, a violent crime.

[7] At trial, defendant maintained that he did not know Sabin's name at that time and disputed Rhoads' testimony that Sabin and defendant were "best friends."

[8] At trial, defendant testified that he did not mean to say that Sabin told him to kill someone because Sabin never did so. Instead, defendant understood that he was supposed to put the gun away and "hold it for protection."

At the end of the interview, the police provided defendant with a written statement summarizing their questions and his answers. Defendant reviewed the summary and signed each page. One of the questions posed asked what occurred after Sabin handed the gun back to defendant. In part, defendant's answer was that Sabin told him to "do something with it."

At trial, defendant testified. Contrary to defendant's interview, he admitted going to the bar in Sabin's car. Defendant testified that he saw Marroquin's gun in the front of his pants during the altercation near the punching bag machine, noting that the video showed everyone backing away when that occurred. Defendant did not know whether Sabin acknowledged seeing the gun in the bar; however, Rhoads grabbed Sabin and "probably let him know. . . ." Defendant thought he was just going to give the gun to Sabin, and, when Sabin returned it to him, defendant had it "there for protection." Sabin's anticipated fistfight with Ehly was not supposed to escalate to include weapons. At that time, defendant did not know Sabin's name.[9] Defendant discharged the gun when he saw Marroquin reaching in his pants or placing his hands in his pants, but he did not fire until he saw Marroquin's "hand on the handle." Defendant claimed that there was a shadow in the video reflecting "the area where the gun was coming out." Defendant fled because he was scared and did not know what to do. Defendant, Rhoads, and one of defendant's cousins went to defendant's grandmother's house.

On cross-examination, when the prosecutor noted the security officer's presence close to Marroquin during the punching bag incident, defendant said that Marroquin was behind the security officer so he did not see Marroquin with the gun. Despite knowing that Marroquin was armed, defendant did not leave the parking lot. Defendant explained that he did not have a driver's license and he was waiting for a ride from the mother of Rhoads' children. The prosecutor further challenged defendant's contention that he only shot at Marroquin because the bar's security officer testified that there was a break between the first two shots defendant fired at the unarmed men before turning and firing the remaining shots in the direction of the bar's door. Similarly, Ehly testified that there was a break between the initial and the remaining shots.[10] The prosecutor further pointed to surveillance footage showing defendant had his arm out[11] and his feet facing toward Ehly and his companion, who were unarmed, when the bar door was closed and Marroquin was not present. Defendant continued to maintain that he only shot at Marroquin. Defendant conceded that Marroquin was not seen with a gun in the bar's video footage.

After the jury convicted defendant,[12] this appeal followed.

---

[9] Rhoads testified that defendant and Sabin were best friends. Defendant said that this was because Rhoads saw them together.

[10] When interviewed by the police, Rhoads' response also supported this scenario.

[11] Defendant later said that he may have been talking with his hands.

[12] In a separate case, Sabin was originally charged with first-degree premeditated murder, AWIM, being a felon-in-possession of a weapon, MCL 750.224f, and three counts of felony-firearm, second offense, MCL 750.227b(2), as a fourth or subsequent habitual offender, MCL 769.12. Wayne County Circuit Court Case No. 2019-006219-01-FC. Sabin accepted a plea offer and was

## II. THE FLIGHT INSTRUCTION

"Evidence of [an accused's] flight is admissible to support an inference of consciousness of guilt." *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003). During trial, defendant testified that after he fired the gun, he "ran off" because he "was scared." After getting a ride, defendant went home. Ten days later, the police found and questioned him.

On appeal, defendant contends that the trial court erred when it instructed the jury on flight from the crime scene consistent with Mich Crim JI 4.4. Because defendant waived this claim, he is not entitled to appellate relief.

"[W]aiver is the intentional relinquishment or abandonment of a known right." *Carines*, 460 Mich 750, 762 n 7; 597 NW2d 130 (1999) (quotation marks and citation omitted). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citations omitted).

"A defendant may waive his or her challenge to jury instructions." *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019). "A defendant waives an issue by expressly approving of the trial court's action. When the trial court asks whether a party has any objections to the jury instructions and the party responds negatively, it is an affirmative approval of the trial court's instructions." *Id*. (citations omitted); see also *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) ("because defense counsel here explicitly and repeatedly approved the instruction, [the] defendant has waived the error").

In this case, the parties discussed the final jury instructions outside the jury's presence. The trial court informed the parties that it would give M Crim JI 4.4. Defense counsel did not object.

Later, the court instructed the jury:

[T]here's been some evidence that the Defendant may have run away after the alleged crimes. This evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake or fear. However, a person may also run or hide because of a consciousness of guilt. You must decide whether the evidence is true and if true whether it shows that the Defendant had a guilty state of mind.

Thereafter, again outside the jury's presence, the trial court specifically asked counsel: "Are there any issues as to the jury instructions?" Defense counsel replied: "No, your Honor. Satisfied."

---

sentenced to 7 to 20 years' imprisonment for second-degree murder to be served consecutively to a mandatory five-year prison sentence imposed for felony-firearm, second offense.

The record shows that defense counsel affirmatively approved the jury instructions, including the flight instruction. Therefore, defendant waived any error and he is not entitled to appellate relief. *Carter*, 462 Mich at 215; *Miller*, 326 Mich App at 726.

## III. THE VERDICT FORM

Defendant also argues his constitutional right to a trial by jury was violated because of a defective verdict form. Again, defendant is not entitled to relief because he waived this claim.

In discussing the jury verdict form, the trial court specifically inquired about Count I related to the murder charge: "Any issue with the Count I verdict form?" Defense counsel replied: "Um, yeah, I guess that's okay, your Honor." Defense counsel explained that it was a bit different than the format he was used to seeing. The court then asked whether defense counsel wanted part of the verdict form stricken. Defense counsel rejected that option. Although counsel continued to explain that it was not typically the way the verdict form was structured in regard to murder, he said, "but[,] if the Court wants to do it that way[,] I don't have a real big objection to it." The court observed that "it [got defense counsel] where [he] need[ed] to be for [his] client, correct?" Defense counsel responded: "Correct." When the prosecutor also asked about the verdict form for Count I, defense counsel said: "I think the top of that kind of explains that. You know, each count requires a check so I think it's fine."

After instructing the jury, the trial court again asked: "[A]re we good on the verdict form that we discussed this morning?" Defense counsel replied: "Yes."

Because defense counsel affirmatively approved the verdict form, the defense waived any error. *Miller*, 326 Mich App at 726. See also *People v Fetterley*, 229 Mich App 520; 583 NW2d 199 (1998) (citations omitted) ("A defendant may not waive objection to an issue before the trial court and then raise it as an error before this Court. To hold otherwise would allow defendant to harbor error as an appellate parachute."). Thus, defendant is not entitled to appellate relief. *Id*.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also raises two ineffective assistance of counsel arguments. First, defendant argues that defense counsel was ineffective for failing to request a voluntary manslaughter instruction. Second, defendant argues he was denied effective assistance of counsel because defense counsel did not object to a defective verdict form. We disagree.

"Both the Michigan and the United States Constitutions require that a criminal defendant enjoy the assistance of counsel for his or her defense." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012), citing Const 1963, art 1, § 20; US Const, Am VI. "In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51.

"In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id*. at 52. "Initially, a court must determine whether the strategic choices [were] made after less than complete investigation, and any choice is reasonable

-7-

precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. (quotation marks and citation omitted). "A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments." *People v Grant*, 470 Mich 477, 486; 684 NW2d 686 (2004). An appellate court "evaluate[s] defense counsel's performance from counsel's perspective at the time of the alleged error and in light of the circumstances. Thus, counsel's words and actions before and at trial are the most accurate evidence of what his strategies and theories were at trial." *Id*. at 487. Counsel's failure "to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## A. THE MANSLAUGHTER INSTRUCTION

Defendant was not denied effective assistance of counsel on the basis of defense counsel's failure to request a voluntary manslaughter instruction. Defendant preserved this issue by filing a motion for remand, which this Court denied.[13] *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020) (footnote omitted).

"Trial counsel's failure to request a jury instruction may constitute an unreasonably deficient level of performance." *People v Yeager*, 511 Mich 478, 490; 999 NW2d 490 (2023). "[A] jury instruction on a necessarily included lesser offense is appropriate if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *Id*. (quotation marks and citation omitted).

"[F]or an act to be considered voluntary manslaughter, the defendant must kill in the heat of passion, the passion must be caused by adequate provocation, and there cannot be a lapse of time during which a reasonable person could control their passions." *Yeager*, 511 Mich at 489. "Provocation is not an element of voluntary manslaughter. Rather, provocation is the circumstance that negates the presence of malice." *People v Mendoza*, 468 Mich 527, 536; 664 NW2d 685 (2003) (citations omitted). "The provocation must be sufficient to cause the defendant to act out of passion rather than reason, but it also must be sufficient to cause a reasonable person to lose control, not just the specific defendant." *Yeager*, 511 Mich at 489.

"Common-law murder encompasses all killings done with malice aforethought and without justification or excuse." *Mendoza*, 468 Mich at 533. "[T]he distinction between murder and voluntary manslaughter is the element of malice, which in voluntary manslaughter is negated by the presence of provocation and heat of passion." *Yeager*, 511 Mich at 491 (quotation marks and citation omitted). "[T]he elements of voluntary and involuntary manslaughter are included in the elements of murder. Thus, both forms of manslaughter are necessarily included lesser offenses of murder." *Mendoza*, 468 Mich at 541. "[B]ecause both voluntary and involuntary manslaughter are necessarily included lesser offenses and inferior to murder under MCL 768.32, when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must

---

[13] *People v Salinas*, unpublished order of the Court of Appeals, entered September 30, 2024 (Docket No. 369707).

be given if supported by a rational view of the evidence." *Yeager*, 511 Mich at 490 (quotation marks and citations omitted).

Defense counsel's performance was not objectively unreasonable because the facts presented at trial did not support a voluntary manslaughter instruction. Our Supreme Court has explained that "[t]he word 'passion' in the context of voluntary manslaughter describes a state of mind incapable of cool reflection. A defendant acting out of a state of terror, for example, is considered to have acted in the 'heat of passion.' " *People v Townes*, 391 Mich 578, 589 n 3; 218 NW2d 136 (1974) (citations omitted). Defendant argues the provocation existed in this case because Marroquin brandished a weapon during the verbal altercation near the punching bag game, resulting in defendant acting under a state of trauma and terror when he fired the shots. Initially, we note that there was no evidence Marroquin "brandished" any weapon inside the bar. Although Rhoads believed he saw something in Marroquin's pants and defendant testified that Marroquin showed "the gun off" in his pants, there was no testimony Marroquin pulled out any weapon. Further, it was not reasonable to believe Marroquin was armed for numerous reasons. The bar's security personnel searched patrons for weapons at the point of entry. Reyes testified that Marroquin wore his pants loosely, such that she could see his boxers. And Marroquin was seen pulling up his pants in the security footage, indicating that it would have been challenging for him to safely secure a weapon in his waistband. In addition, there was surveillance footage of Marroquin at the scene before and after he was mortally wounded, but no weapons are seen. Further, the police, who had arrived quickly, found no gun on Marroquin or at the scene. Finally, defendant's own testimony reflected that he did not act out of passion or loss of control, but out of what he described as an objectively reasonable fear for his life.

In any event, even if Marroquin had provoked defendant during the verbal altercation, a significant amount of time elapsed between that altercation and the shooting. See *Yeager*, 511 Mich at 489. After the argument, defendant and his group left the bar. But, rather than leaving the scene, defendant remained in the bar's parking lot for approximately 10 minutes, retrieved Sabin's gun, chatted with his group as well as the bar's manager,[14] and waited for Sabin's anticipated fistfight with Ehly. The period of time defendant waited in the parking lot was sufficient to allow his "blood to cool and reason to resume its habitual control." *People v Fortson*, 202 Mich App 13, 19; 507 NW2d 763 (1993).

Simply put, there is no evidence that defendant acted in a heat of passion. Defendant made a calculated decision to wait in the parking lot, knowing that Sabin wanted to fight Ehly. Defendant further chose to retrieve the gun from Sabin's car after Sabin gave him the keys. Defendant brought the gun to Sabin, who racked it and returned it to defendant. Even assuming defendant only had the gun because he believed he may have needed it to protect himself, this still does not support a finding that defendant acted in the heat of passion.

---

[14] Defendant admitted that no one informed the bar manager that Marroquin, who remained inside the bar, was armed and it could be dangerous if a fight occurred.

In sum, without evidentiary support for a voluntary manslaughter instruction, defense counsel's decision not to request one cannot constitute deficient performance.[15] See *Ericksen*, 288 Mich App at 201. Nor can defendant demonstrate prejudice from counsel's failure to request such an instruction. Therefore, defendant is not entitled to a new trial.[16]

## B. VERDICT FORM

Nor was defendant denied effective assistance of counsel because defense counsel failed to object to the jury verdict form. This issue is unpreserved because defendant did not move for a new trial or *Ginther* hearing below or file a motion in this Court to remand to the trial court for a *Ginther* hearing on this basis. *Abcumby-Blair*, 335 Mich App at 227; *People v Jackson*, 313 Mich App 409, 431; 884 NW2d 297 (2015) (footnote omitted). Thus, "our review is limited to errors apparent on the record." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008).

A verdict form "is treated as, essentially, part of the package of jury instructions." *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). "A criminal defendant is entitled to have a properly instructed jury consider the evidence against him. Further, a criminal defendant is deprived of his constitutional right to a jury trial when the jury is not given the opportunity to return a general verdict of not guilty." *People v Wade*, 283 Mich App 462, 467; 771 NW2d 447 (2009), judgment rev'd 485 Mich 986 (2009), order vacated on recon and lv den 486 Mich 909 (2010) (quotation marks and citations omitted). "Jury instructions are to be read as a whole rather than extracted piecemeal to establish error. And even if somewhat imperfect, instructions do not create error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Id*. at 464 (citations omitted).

---

[15] In the prosecution's brief on appeal, it contends that the court began to read the manslaughter instruction before the trial prosecutor interrupted, stating that the instruction was improper. Defense counsel did not object and later said that he was satisfied with the final instructions, suggesting that defense counsel acted strategically in failing to request the manslaughter instruction.

Technically, we note that the trial court did not read M Crim JI 16.8 (voluntary manslaughter) or 16.9 (voluntary manslaughter as a lesser included offense of murder). Instead, the court was instructing the jury about the mitigating circumstances explained in M Crim JI 17.4 pertaining to the AWIM charge. The court informed the jury that a defendant may only be convicted of AWIM if he would have been guilty of murder had the person assaulted actually died. Thus, "[i]f the assault took place under circumstances that would have reduced the charge to manslaughter if the person had died, the defendant [was] not guilty of [AWIM]." The trial court then began to explain how voluntary manslaughter differed from murder when the prosecutor interjected that it was improper to read the instruction because it was inapplicable given the facts in this case. Ultimately, the court struck the instruction without objection from defense counsel, who also later indicated his satisfaction with the instructions. With this clarification, we agree with the prosecution's argument.

[16] To the extent defendant argues this Court should remand for a hearing under *People v Ginther*, 390 Mich App 436, 441-442; 212 NW2d 922 (1973), we deny defendant's request.

-10-

In *Wade*, this Court found a jury verdict form was defective, where it "did not give the jury the opportunity to return a general verdict of not guilty." *Id*. at 468. In *Wade*, the verdict form informed the jury: "YOU MAY ONLY RETURN ONE VERDICT FOR EACH COUNT." *Id*. at 465 (citation omitted.) For Count 1, the verdict form gave the jury the option to find defendant guilty or not guilty of first-degree murder, or guilty of second-degree murder, or guilty of involuntary manslaughter. *Id*. at 465. This Court explained: "[T]he verdict form would not have been defective if it had included a box through which the jury could have found defendant not guilty of second-degree murder and not guilty of involuntary manslaughter." *Id*. at 468. And,

> [d]espite the trial court's efforts to clarify the verdict form with its instructions, because of the way the verdict form was set up, the jury was not given the opportunity to find defendant either generally not guilty or not guilty of the lesser-included offenses such that his constitutional right to a trial by jury was violated. [*Id*.]

In this case, the jury verdict form stated, in relevant part:

<u>**POSSIBLE VERDICTS**</u>:

You may return only one (1) verdict for each charge. **Mark only one (1) box per Count on this Verdict Form.**

## Count 1

□ Not Guilty of Homicide — Murder First Degree — Premediated of Neri Marroquin; AND the Less Serious Offense of Second Degree Murder of Neri Marroquin;

**OR**

□ Guilty of Homicide — Murder First Degree — Premediated of Neri Marroquin;

**OR**

□ Guilty of the Less Serious Offense of Second Degree Murder of Neri Marroquin.

## Count 2

□ Not Guilty of Assault with Intent to Murder Francisco Torres AND the Less Serious Offense of Assault with Intent to do Great Bodily Harm Less Than Murder of Francisco Torres;

**OR**

□ Guilty of Assault with Intent to Murder Francisco Torres;

**OR**

☐ Guilty of the Less Serious Offense of Assault with Intent to do Great Bodily
Harm Less Than Murder of Francisco Torres.

The verdict form, in this case, was imperfect. The form did not give the jury the option to separately find defendant not guilty of the charged offense of first-degree murder and lesser included offense of second-degree murder. Similarly, the verdict form did not give the jury the option to separately find defendant not guilty of the charged offense of assault with intent to murder and the lesser included offense of assault with intent to do great bodily harm less than murder. Nevertheless, the verdict form in this case is distinguishable from the verdict form in *Wade*. In *Wade*, the jury was not given the option to find the defendant not guilty of the lesser offenses of second-degree murder and involuntary manslaughter. *Id*. at 465. In this case, for defendant's homicide charge, the jury was given the option to select: "Not Guilty of Homicide — Murder First Degree — Premediated of Neri Marroquin; AND the Less Serious Offense of Second Degree Murder of Neri Marroquin." For defendant's assault charge, the jury was given the option to select: "Not Guilty of Assault with Intent to Murder Francisco Torres AND the Less Serious Offense of Assault with Intent to do Great Bodily Harm Less Than Murder of Francisco Torres." Unlike in *Wade*, the jury verdict form provided the jury the opportunity to return a not guilty verdict for both the offense charged and the lesser included offense. Therefore, the jury verdict form did not deprive defendant of the right to a jury trial. See *Id*. at 467.

And, although inconsistent with the language in the Model Criminal Jury Instructions, see M Crim JI 3.28 through M Crim JI 3.31, the verdict form in this case "fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Wade*, 283 Mich App at 464. The jury was "given the opportunity to return a general verdict of not guilty." *Id*. at 467. Because defendant admitted to firing the gun, the not guilty boxes sufficiently gave the jury the option to accept defendant's theory of self-defense and acquit him. Accordingly, defense counsel's decision to forego challenging the verdict form was reasonable and defendant has not satisfied his dual burden of establishing that counsel performed deficiently and that he was prejudiced. Defendant is not entitled to a new trial.

Affirmed.

/s/ Anica Letica
/s/ Christopher M. Murray
/s/ Sima G. Patel

-12-